# United States Bankruptcy Court, Northern District of Illinois

| JUDGE | Janet S. Baer | Case No. | 15 B 21282 |
|---|---|---|---|
| DATE | January 5, 2016 | | |
| CASE TITLE | Baja River East, LLC | | |
| TITLE OF ORDER | Order Granting in Part and Denying in Part AH-River East, LLC's Motion to Enforce Debtor-in-Possession's Obligation to Pay Post-Petition Rent | | |

## DOCKET ENTRY TEXT

AH-River East, LLC's Motion to Enforce Debtor-in-Possession's Obligation to Pay Post-Petition Rent is granted in part and denied in part. AH-River East, LLC is awarded post-petition base rent, to be paid by Baja River East, LLC, in the amount of $14,871 per month from June 19, 2015 (when the chapter 11 case was filed) until Baja River East, LLC vacates the premises at issue.

[For further details see text below.]

## STATEMENT

This case is before the Court on the motion of AH-River East, LLC, the Debtor's landlord (the "Landlord"), to enforce the Debtor's obligations to pay post-petition rent pursuant to § 365(d)(3) of the Bankruptcy Code ("the Rent motion").[1] The Landlord asserts that the Debtor may not continue to occupy and use the Premises at issue unless it pays post-petition monthly rent of at least the base amount set forth in a Lease executed by the Debtor from June 19, 2015 (the "Petition Date") and continuing as long as this case remains pending.[2] The Debtor argues that it owes no post-petition rent to the Landlord because the Landlord agreed to full rent abatement due to the Landlord's construction and interference with the Debtor's access to and use of its Premises. The Debtor contends that such rent abatement was in effect until the later of January 1, 2015 or whenever the Landlord completed the work in and on the Debtor's Premises and provided the Debtor once again with full access to the Premises. The Debtor alleges that the Landlord has yet to complete the work and provide the Debtor with full access.

The Court conducted an eight-day evidentiary hearing on the Landlord's Rent motion (the "Evidentiary Hearing"). During that hearing, the Court heard the testimony of five witnesses: Brian Pleviak, Brian Khousakoun, Matthew O'Kane, Robert Stejskal, and Rafael

---

[1] Unless otherwise noted, all statutory and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 to 1532, and the Federal Rules of Bankruptcy Procedure.

[2] Capitalized terms are defined in the "Facts and Background" section below.

1

Gaspar. Additionally, the Court admitted 216 documents into evidence, many of which were photographs.

Also pending at the time of the Evidentiary Hearing was the Landlord's motion for relief from the automatic stay wherein the Landlord seeks to have the stay modified so that it can continue to prosecute its forcible entry and detainer action in the Circuit Court of Cook County.[3] At the commencement of the Evidentiary Hearing, the Landlord agreed that its stay relief motion would be "tabled" pending the Court's decision on the Rent motion because the outcome of the Rent motion would likely affect the stay relief matter. *See* Trial Tr. vol. 1, 6-10, Oct. 6, 2015.

Further, during the pendency of the Rent motion, the Debtor filed: (i) a motion to set a hearing to determine cure amounts for the Lease pursuant to § 365,[4] and (ii) a motion to extend the time within which the Debtor must assume or reject the Lease pursuant to § 365(d)(4).[5] The motion to determine cure amounts has not been set for hearing although the matter appears to be fully briefed. It has been carried along with the Rent motion and is set for status on January 5, 2016. The motion to extend the time to assume or reject is set for hearing also on January 5, 2016. Pursuant to § 365(d)(4), the outside date by which the Court may extend the time to assume or reject the Lease without the Landlord's consent is January 15, 2016, which is 210 days after the Petition Date and 10 days from January 5, 2016.

Based on the pleadings submitted, the evidence presented, and the arguments of the parties, the Court is now ready to rule.

## FACTS AND BACKGROUND

On June 1, 2010, the Debtor, as tenant, entered into a Retail Space Lease with Cindy O'Drobinak, as receiver in Case No. 09 CH 08486 pending in the Circuit Court of Cook County (the "Lease"). Ex. 1. The Landlord acquired the building in which the Premises are located (the "Building") on March 15, 2013 and succeeded to the receiver's rights and obligations under the Lease. AH-River East's Mot. for Relief from Automatic Stay Pursuant to 11 U.S.C. § 362(d)(1), Ex. B, Dkt. No. 24, filed July 8, 2015; Joint Pretrial Statement ("PT Stmt."), Dkt. No. 88, at 6, ¶ 4, filed Sept. 23, 2015. At the time of the execution of the Lease, the Building was in foreclosure, was likely to be sold, and was likely to undergo rehabilitation at some point. *See* Lease, § 1.3; PT Stmt., at 6, ¶ 4. The ten-year Lease contains, among other rental provisions, a schedule for base rent for the first forty-eight months of the lease term and annual adjustments thereafter based on the Consumer Price Index. In accordance with § 3.1 of the Lease, the Landlord adjusted the monthly base rent to $20,346.70 for the months of July 2015 through July 2016, which are months 62 through 72 of the Lease term. PT Stmt., at 7, ¶ 8.

---

[3] Dkt. No. 24, filed July 8, 2015.

[4] Dkt. No. 64, filed Aug. 24, 2015.

[5] Dkt. No. 99, filed Oct. 7, 2015.

2

The Lease also contains several relevant provisions related to repairs, maintenance, access, and rent abatement. These provisions are found in the Lease in, among other places, § 1 entitled "Lease of the Premises"; § 1.3 entitled "Common Area"; § 8.8 entitled "Interruption"; and § 12 entitled "Rights Reserved to Landlord." These provisions discuss: (i) the Landlord's rights to perform rehabilitation work; (ii) restrictions on the performance with respect to the work; and (iii) the effect the work will have on the Debtor's Premises, operation of its business, liability, damages, and the Debtor's obligations to pay rent under the Lease.

In March 2013 when the Landlord acquired the Building and succeeded to the receiver's rights and obligations under the Lease, the Debtor was fully occupying the Premises. According to the Debtor, the Premises consist of six operational areas: (i) the Bar & Grill, including the kitchen; (ii) the Main Dining Room; (iii) the Private Dining Room; (iv) the Atrium; (v) the Dock area; and (vi) the Sidewalk Café.[6] Exs. 3 & 4, ¶ 6. Prior to the Landlord's acquisition of the Building, the Building was in distress from a failed prior development and had been used primarily as office and retail space. Pleviak,[7] Trial Tr. vol. 1, 103, Oct. 6, 2015. After acquisition, the Landlord decided to convert a significant portion of the Building into residential loft condominiums. *Id.*; Ex. XXXX. From the testimony and documents admitted into evidence, it is clear that in late 2013 and early 2014 when the Landlord started to move forward with the renovations, the parties understood that those renovations would be significant. They would include the running of such services as sewer, water, other plumbing, and electrical throughout the Building. And, because the Debtor was renting a large portion of the first floor of the Building, the piping, conduit, and other mechanicals required to deliver these services to the six new residential floors above the Debtor's Premises would need to be run in and along the ceilings and walls of the Debtor's Premises. O'Kane, Trial Tr. vol. 3, 63-64, October 16, 2015.

The Landlord recognized that having a fully operational restaurant in the Premises on the first floor of the Building during the extensive renovations and having to work around the Debtor's business operations would make the renovations more difficult and time consuming. Also, the Landlord wanted to reclaim from the Debtor certain portions of the Premises for its own use. Pleviak, Trial Tr. vol. 1, 136-37, Oct. 6, 2015; vol. 2, 29, Oct. 13, 2015. Thus, the parties began good faith negotiations to address both the Landlord's and the Debtor's concerns and needs. The negotiations began in approximately May 2014 and were ongoing for what turned out to be eleven months, ending in April, 2015. *See* Ex. 18, at 2; Pleviak, Trial Tr. vol. 1, 156-57, Oct. 6, 2015; Ex. 91; Pleviak, Trial Tr. vol. 2, 51-53, Oct. 13, 2015.

Many of the negotiations between the parties are outlined in email correspondence and draft documents prepared during this time period. The Landlord wanted the Debtor to shut down its operations completely for several months while the Landlord did the necessary renovations. O'Kane, Trial Tr. vol. 3, 56-64, Oct. 16, 2015. Initially, the Debtor appeared amenable to a

---

[6] Use of the Dock area and the Sidewalk Café are weather-dependent, so those areas may not have been in actual use when the Landlord first acquired the Building. The Dock area is subject to a separate Floating Dock Rider to the Lease, and the Sidewalk Café is considered part of the "Outdoor area" of the Building as outlined in § 6.3 of the Lease.

[7] Unless otherwise noted, all references to the names of witnesses are to their testimony on the record.

shutdown of its existing operations and a complete re-concepting of the restaurant. Stejskal, Trial Tr. vol. 4, 132-34, 138-40, Oct. 26, 2015. However, the Debtor had concerns about, among other things, maintaining its licenses to operate, including its liquor license which required certain minimum food sales. Gaspar, Trial Tr. vol. 6, 171, 173-79, Nov. 4, 2015. Although the Debtor had discussions with a potential new investor about re-concepting the restaurant, those discussions were preliminary at the time negotiations with the Landlord commenced. Stejskal, Trial Tr. vol. 4, 96, 121-23, Oct. 26, 2015.

The parties came close to an agreement at the end of July 2014 which culminated in a document entitled "Agreement Regarding Existing Premises and for New Premises" dated July 29, 2014. Ex. LLLL (the "Letter Agreement"). The Letter Agreement was executed by the Landlord and sent to the Debtor. Stejskal, Trial Tr. vol. 4, 20, Oct. 26, 2015. The Debtor in turn executed the document but added two handwritten notations which were never countersigned and accepted by the Landlord. *Id.* at 20-21, 125-31; Ex. 111, at 1, bullet point 3 under "Quay"; Pleviak, Trial Tr. vol. 1, 241-42, 275-76, 281-82, Oct. 6, 2015. Thus, the parties disagree as to whether the Letter Agreement ever became a final and binding agreement.

At about the time of the exchange of the Letter Agreement, several significant events occurred. First, the Landlord began extensive construction *in* the Debtor's Premises as contemplated by the Letter Agreement. *Id.* at 31. Notably, that construction included the installation of a drywall enclosure to wall off the Debtor's Main Dining Room for over two months. Gaspar, Trial Tr. vol. 6, 101-02, Nov. 4, 2015; Stejskal, Trial Tr. vol. 4, 25, Oct. 26, 2015; Letter Agreement, at 1. The Main Dining Room and the Private Dining Room, which could be accessed only from the Main Dining Room, Stejskal, Trial Tr. vol. 4, 26, Oct. 26, 2015, were completely shut down and inaccessible for use by the Debtor during this time. The Landlord removed or destroyed, among other things, the Debtor's ceiling and wall treatments, light fixtures, and other tenant improvements in the Main Dining Room, removed portions of the ceiling in the Private Dining Room, and installed extensive sewer, water, and other piping and conduit throughout the space. *Id.* at 24-29; Gaspar, Trial Tr. vol. 5, 32-35, Nov. 2, 2015.

The Debtor finally regained access to the Main Dining Room and Private Dining Room in October 2014, but the ceiling and wall treatments were not replaced by the Landlord. Instead, the Debtor quickly painted the piping and other mechanicals in the Main Dining Room and re-opened it for use in its altered state. Gaspar, Trial Tr. vol. 5, 156-57, Nov. 2, 2015. The Private Dining Room was not repaired, and at some point the floor was damaged due to water leakage and debris caused by the renovations. To date, the Private Dining Room still has not been repaired and is not being used by the Debtor, other than for storage. *Id.* at 32-41, 138, 146-49.

Likewise, in September 2014, the Landlord closed down and commenced extensive construction in the Atrium, PT Stmt., at 7, ¶ 8, which included the removal and replacement of all of the windows and the installation of sewer, water, and other piping and conduit along the ceiling and walls of the Atrium, Gaspar, Trial Tr. vol. 5, 39-40, 165, Nov. 2, 2015. Again, in order to do such installation, the Landlord removed and/or destroyed many of the Debtor's ceiling fixtures and other tenant improvements. *Id.* at 39, 112. The Landlord also ripped out the floor of the Atrium after it was damaged by water due to, among other things, the Landlord leaving the area open to the weather during the window replacement. *Id.* at 39-40. Additionally,

the Landlord knocked several holes in the brick walls of the Atrium, ultimately installing an emergency door at one end, *id.* at 155, 173, 198, and recently installing a large HVAC unit, *id.* at 114-16. The Atrium remains in a state of disrepair and is not being used by the Debtor. Debtor's Objection to AH-River East's Mot. to Enforce Debtor-in-Possession's Obligation to Pay Post-Petition Rent, Dkt. No. 60, Ex. A, Decl. of Rafael Gaspar, at 2, ¶ 6, filed on Aug. 14, 2015 ("Gaspar Decl."), Gaspar, Trial Tr. vol. 5, 138, Nov. 2, 2015.

The testimony and exhibits also show that from time to time, from commencement of construction to date, debris from the construction fell into the Debtor's Premises, water leaked into the Premises, various ingresses into and egresses from the Premises were altered, blocked, or impaired, and the electricity, cable, and water were shut down. *See, e.g.,* Stejskal, Trial Tr. vol. 4, 169-73 (water), 173-74, 254 (debris), 174-75 (cable), Oct. 26, 2015; Gaspar, Trial Tr. vol. 6, 127-30, 142 (debris), 135-38, 140-41, 146-47, 148-49, 155 (water), 139-40 (cable), 147-48, 155 (electricity), Nov. 4, 2015; O'Kane, Trial Tr. vol. 3, 120-21 (electricity), Oct. 16, 2015; Khousakoun, Trial Tr. vol. 2, 169-72, 196 (electricity), 172 (water), 193-95 (debris), Oct. 13, 2015; *see generally* Ex. E. The rehabilitation work affecting the Premises appears to have taken much longer than the parties expected when they negotiated the Letter Agreement. The Landlord alleges that the work took longer than anticipated because it could not come to terms with the Debtor for a shutdown of its operations, which forced the Landlord to work around the Debtor's ongoing operations. *See, e.g.,* O'Kane, Trial Tr. vol. 3, 56-64, 85-87, 116-20, Oct. 16, 2015.

The evidence further shows that the parties continued to negotiate the terms of a new lease until April 2015. During those negotiations, the Debtor: (i) continued to operate the restaurant in the Bar & Grill area; (ii) operated the Main Dining Room from mid-October 2014 on; and (iii) had access to the Private Dining Room, but it remained in a state of great disrepair. The Debtor also had the use of the Sidewalk Café in the summer of 2015, with some interruptions for various construction-related matters. *See* Gaspar, Trial Tr. vol. 5, 97-98, 110, Nov. 2, 2015; Exs. AAAA & GGGG; Gaspar Decl., at 2, ¶ 6 & n.2. The Debtor has not been able to use the Dock area since at least August 2014. First it was not available due to the Landlord's scaffolding. Gaspar, Trial Tr. vol. 6, 106-07, Nov. 4, 2015. Additionally, the Debtor was not able to use the Dock area in 2015 because it is accessible to customers only from the Atrium, which remains closed and in disrepair. The Landlord continues to do extensive renovations on the Building. And the parties have never reached agreement on the terms a new lease. Pleviak, Trial Tr. vol. 1, 189, Oct. 6, 2015.

On April 24, 2015, about two months prior to the Petition Date, the Landlord sent the Debtor a "Ten (10) Day Notice of Monetary Default," Ex. 5, alleging that the Debtor owes a total of $448,610.55 for past due rent for the months of December 2013 through April 2015, as well as for other fees and charges. The notice stated that if such rent was not paid before the expiration of ten days, the Debtor's tenancy and right of possession would be terminated. The Landlord also sent a second notice, entitled "Landlord's Ten (10) Day Notice to Quit," Ex. 6, in which the Landlord contended that certain non-monetary defaults had occurred, namely: (i) the bankruptcy filing of Michael K. O'Malley, a guarantor on the Lease, and (ii) the Debtor's involuntary dissolution. The Landlord alleges that as a result of these non-monetary defaults, the Landlord has elected to terminate the Debtor's tenancy and right of possession.

5

The Debtor maintains that it does not owe any rent to the Landlord because the Landlord agreed to abate all rent until the construction on the Premises was completed and the Debtor was provided once again with full use of and access to the Premises. The Debtor further alleges that, to date, the Landlord has still not completed construction on the Premises and returned full use of the Premises to the Debtor. PT Stnt,, at 4, ¶ 1. The Debtor concedes that it was not constructively evicted from the Premises. Debtor's Reply in Support of Mot. to Set Evidentiary Hr'g to Determine Cure Amount for Unexpired Lease with AH-River East, LLC, Dkt. No. 132, at 20.

## DISCUSSION

The issue before the Court is whether the Debtor owes the Landlord post-petition rent under § 365(d)(3). The Landlord asserts that the Debtor may not continue to occupy the Premises unless it pays post-petition monthly rent of at least the base amount under the Lease. The Landlord also asserts that the Lease was terminated pre-petition as a result of the ten-day notices and the expiration of the time to cure the defaults.

Section 365(d)(3) requires a debtor to make timely payments of the full rent due prior to assumption or rejection of a lease of nonresidential real property. 11 U.S.C. § 365(d)(3); *In re Telesphere Commc'ns, Inc.*, 148 B.R. 525, 531 (Bankr. N.D. Ill. 1992). Courts apply state law to determine the rights and obligations of the parties when deciding a motion under § 365. *See, e.g., In re LJP, Inc.*, 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982).

In order to decide whether the Debtor owes post-petition rent to the Landlord, the Court must determine which agreement or agreements between the parties govern their relationship. In that respect, the Court starts with the Lease that was admitted into evidence, the terms of which will be discussed in detail below. The parties stipulate that the Lease is pertinent to this dispute. PT Stmt., at 6, ¶ 5. No new lease was ever agreed to or executed by the parties. Pleviak, Trial Tr. vol. 1, 189, Oct. 6, 2015. The Lease is to be construed in accordance with and governed by the laws of the State of Illinois. Lease, § 25.1.

The Landlord argues that the Lease, and only the Lease, governs the legal relationship of the parties and that the Debtor has been in substantial default under the Lease since at least April 2014. The Debtor alleges that, pursuant to an agreement with the Landlord, it was granted rent abatement under § 8.8 of the Lease, beginning with what would have been the rent for April 2014, due to the construction and its interference with the Debtor's access to and use of the Premises. The Debtor further alleges that the Letter Agreement provided that, among other things, the Landlord would have access to the Premises to perform certain work in exchange for the Landlord's agreement to abate rent until the later of either (i) January 1, 2015, or (ii) whenever the Landlord completed its work in the Debtor's space. PT Stmt., at 4, ¶ 1.

Contracts that modify the interests of the parties in real estate must be in writing to be enforceable under the Statute of Frauds in Illinois. *Jayson Invest., Inc. v. Kemp*, 746 F. Supp. 807, 814 (N.D. Ill. 1990). The Lease includes an integration clause, which provides that the "Lease contains the entire agreement of the parties and may not be modified except by an instrument in writing signed by both Landlord and Tenant." Lease, § 24.2 entitled "Entire

6

Agreement." Nevertheless, Illinois courts routinely enforce promises made in the context of ongoing negotiations. *See Dawson v. Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992) ("The fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise."); *Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 426 (7th Cir. 1989) ("Illinois ... allows parties to approach an agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics.").

When determining whether the parties had a meeting of the minds with respect to all terms of even a preliminary agreement, Illinois courts follow the mirror image rule. *See, e.g., Peoria Assocs. Ltd. P'ship v. Best Buy Co., Inc.*, 995 F. Supp. 823, 824 (N.D. Ill. 1997) ("[The mirror image rule] requires that the offeree accept exactly what the offeror offers—the acceptance must mirror the offer."); *see also First Nat'l Bank v. Hall*, 101 U.S. 43, 49 (1879) ("[T]he meeting of minds and the mutuality of assent to the same thing ... are necessary to create a contract."). If a response to an offer proposes modifications to any term of the offer, no matter how slight, minor, or non-substantive the changes may be, such a response is not an acceptance to enter into a contractual relationship; rather, it is a counteroffer that seeks acceptance by the original offeror. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 432 (7th Cir. 1993).

As discussed above, two handwritten notations were added to the Letter Agreement by the Debtor's principal before it was signed by the Debtor. One notation related to an expensive piece of equipment and the other to certain dock space. The notations, which constitute a counteroffer to the terms in the Letter Agreement, were never countersigned and accepted by the Landlord. As such, the Letter Agreement fails to represent a binding contractual agreement under the mirror image rule. The Letter Agreement also clearly provides that the Lease is still the operative legal document between the parties. It states that: "Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not supercede [*sic*] the terms and conditions set forth in the Existing Lease, including without limitation, Landlord's rights to complete work in the Premises and the Building generally." Letter Agreement, at 5.

Further, the Letter Agreement contemplates a re-concepting of the Debtor's restaurant and the participation of new investors. That re-concepting did not occur, and new investors did not become involved in the Debtor's operations within the time frame contemplated by the parties at the time the Letter Agreement was being negotiated. Stejskal, Trial Tr. vol. 4, 269-70, Oct. 26, 2015. The Debtor's principal himself conceded soon thereafter that the terms of the new lease outlined in the Letter Agreement might not work for the Debtor given the possibility that the contemplated new investor would not become involved. *Id.*; *see also* Exs. 56 & 99.

From a review of the testimony and the admitted exhibits, the Court concludes that the original Lease — and only the original Lease — is the operative document that controls the legal relationship of the parties. It appears that there was never a meeting of the minds as to the Letter Agreement or any other agreement between the parties with respect to the rental of the Premises or abatement of rent that meets the requirements of the Statute of Frauds or the mirror image rule.

The Court recognizes that there is some correspondence that suggests the Landlord may have agreed to full rent abatement for a period of time, especially when the Debtor did not have access to its Main Dining Room and Private Dining Room. *See* Exs. 109, W, 61, 111, LLLL. That correspondence, however, does not constitute an agreement in writing that meets the requirements of the Statute of Frauds. The Debtor itself seems to concede this point in alleging that the rent abatement was agreed to "pursuant to section 8.8 of the Lease." PT Stmt., at 4, ¶ 1. The Landlord testified that the full rent abatement it was discussing would be in exchange for a full shutdown of the Debtor's restaurant. O'Kane, Trial Tr. vol. 3, 85-87, Oct. 16, 2015. The Landlord alleges that since a full shutdown did not occur, no rent abatement was ever agreed to. *Id.*; Pleviak, Trial Tr. vol. 1, 201, 295, Oct. 6, 2015.

For purposes of this matter, the Court must determine the status of any rent abatement as of June 19, 2015 when the Debtor filed its chapter 11 case. In making its decision, the Court is limited to a review of the Lease alone, as discussed above.

Under Illinois law, a tenant is not responsible to pay rent if: (i) a landlord actually or constructively evicts the tenant, and (ii) the tenant vacates the leased premises within a reasonable time. *See Shaker & Assocs., Inc. v. Med. Techs. Grp., Ltd.*, 733 N.E.2d 865, 872 (Ill. App. Ct. 2000). However, Illinois common law does not control when there are contractual provisions in a lease that address the terms between the parties. *Fitcher v. Milk Wagon Drivers' Union, Local 753*, 46 N.E.2d 921, 925 (Ill. 1943) (quoting *Covenant Mut. Life Ass'n v. Kentner*, 58 N.E. 966, 968 (Ill. 1900) ("[W]herever there is a contract[,] its terms must control the rights of the parties.")).

The Lease was executed by the parties with the clear understanding that the Building would be undergoing rehabilitation and that such rehabilitation could affect the Debtor's Premises from time to time. Section 1.3, paragraph 3 of the Lease states: "Tenant acknowledges that Landlord is contemplating a substantial rehabbing of portions of the Building of which the Premises form a part." The Lease addresses: (i) the Landlord's rehab work that could affect the Premises; (ii) the restrictions placed on the Landlord in doing that work; and (iii) the effect that the work would have with respect to liability, damages, or rent abatement.

### The Work of the Landlord

On the **Premises**, the Lease provides that the Landlord could do the following:

(i) "... install, maintain, use, remove, repair and replace pipes, ducts, conduits, wires, cables and other facilities in the floor, walls, ceilings and other portions of the Premises ... to serve other portions of the Building or the Property." Lease, § 1 entitled "Lease of the Premises."

(ii) "... enter the Premises for the purpose of making such repairs or replacements therein as may be required by this Lease or as Landlord may deem necessary or desirable, including without limitation the rehabilitation or replacement of the systems serving the Building or the

8

                    exterior and structural components thereof ... ." Lease, § 8.8 entitled "Interruptions."

        (iii)    "decorate and make repairs, alterations, additions and improvements, structural and otherwise in or to the Premises (subject to and in accordance with the provisions of the Lease) or in the Building or any part thereof." Lease, § 12.7 entitled "Repairs and Alternations."

In the **Common Areas** of the property, pursuant to § 1.3 of the Lease entitled "Common Area," the Landlord could:

"change the size, location and nature of any common area, add to or delete portions thereof ... temporarily close or consent to the closing of any common areas to make repairs or changes therein ... and take such other actions in regard to the common areas as in Landlord's judgment may be desirable ... ."

With respect to the **Building or Property**, pursuant to § 12.9 of the Lease entitled "Erection of Scaffolds," the Landlord could erect scaffolding as follows:

"in or about the exterior of the Building or Property or any adjacent or nearby building, land, street or alley; to erect scaffolds on the exterior of the Building or in the common area; to make such use of the exterior walls of the Building, the roof of the Building and the exterior portions of the Property as Landlord desires to add, or subtract from the Property."

## Restrictions on the Landlord

The Lease does not permit the Landlord to do the above work on the Premises or in the Building whenever and however it wanted to. There were restrictions.

On the **Premises**, those restrictions were as follows:

        (i)    The installations outlined in § 1.3 were to be in locations that would "not materially interfere with Tenant's Permitted Uses thereof ... and in no event shall such installations be made other than in the wall, in the ceiling, in the floor and/or in access panels thereto."

        (ii)    In performing the repairs outlined in § 8.8, the Landlord agreed to "use all reasonable efforts to minimize any disruption in Tenant's use and occupancy and shall give Tenant prior reasonable notice of such entry (no less than twenty-four (24) hours except in cases of emergency when no such notice shall be required)."

        (iii)    In decorating and repairing, as outlined in §§ 12 & 12.7, the Landlord was to have such rights "exercisable without notice."

In the **Common Areas**, as outlined in § 1.3, the Landlord agreed that it would "use its best efforts to provide Tenant advance notice of any proposed changes [in the Common Areas] which may affect the Premises … ."

In the **Building or the Property**, as outlined in § 12.9, the scaffolding work would "not materially obstruct the entrances or access to the Premises."

**Damages and Rent Abatement**

With respect to the **Premises**, the parties agreed to the following consequences regarding the Landlord's rehab work:

(i) "Landlord does not warrant that any services or Tenant's occupancy will be free from interruptions caused by repairs, renewals, improvements, changes of services, alterations … or other causes." Lease, § 8.8.

(ii) No interruption of service, as outlined in § 8.8, "shall be deemed an eviction or disturbance of Tenant's use and possession of the Premises or any part thereof or render Landlord liable to Tenant for damages by abatement of Rent or otherwise or relieve Tenant from performance of Tenant's obligations under this Lease. Tenant hereby waives and releases all claims against Landlord for damages, both direct and consequential, for any such interruptions or stoppages of services … ."

(iii) If the Tenant's "access to the Premises is prevented by reason of the repairs or rehabilitation to the Premises being made by the Landlord" as a permitted interruption in § 8.8, "Landlord shall not be liable to Tenant, *but Rent shall abate during the period Tenant is unable to gain access to the Premises*" (emphasis added).

(iv) The repairs and alterations to the Premises permitted by § 12.7 will not subject the Landlord to any "liability to Tenant for damages or injury to property, persons or business," and "all claims for damages" are released, will not affect "an eviction or disturbance of Tenant's use or possession or giv[e] rise to any claim for setoff or abatement of Rent … ." Lease, § 12.

With regard to the Landlord's work in the **Common Areas** as outlined in § 1.3, the parties agreed that:

(i) "Landlord shall not be subject to liability therefor, nor shall Tenant be entitled to any compensation, or diminution or abatement of rent, nor shall any such action be deemed an actual or constructive eviction of Tenant;" and,

>   (ii)   "... no reconfiguration or deprivation of any method of ingress or egress to the Property or Building, entrances, exits or common areas, whether temporary or permanent, shall be cause for any abatement or diminution of the rent payable hereunder, nor shall the same give rise to any right of termination by Tenant."

Based on the provisions above, the Debtor waived any claim of damages for the effect on its business or the Premises caused by the Landlord's rehabilitation of the Building, but the Landlord agreed to abate rent if that work prevented the Debtor from accessing its Premises.

In addressing the circumstances under which the Landlord agreed to abate rent as outlined in § 8.8, the Court notes that the Lease does not use the word "complete" or any other modifier in front of the word "Premises." "Premises" is defined in the Lease as Space Numbers 163, 170, 171, and 173, which correspond to at least the Bar & Grill, Kitchen, Main Dining Room, Private Dining Room, and Atrium. The Lease simply states that if the Debtor's "right to access the Premises is prevented" by reason of the Landlord's repairs or rehabilitation, "[r]ent shall abate" during the period that the Debtor is unable to gain access.[8] The Landlord argues that because the Debtor was never denied *complete* access to the Premises, the Debtor is not entitled to rent abatement under § 8.8 of the Lease, or otherwise. Resp. to Debtor's Objection to AH-River East, LLC's Mot. to Enforce Debtor-in-Possession's Obligation to Pay Post-Petition Rent, Dkt. No. 62, filed Aug. 20, 2015, at 2, ¶¶ 4 & 5. The Debtor, in somewhat the same fashion, argues the opposite conclusion. That is, the Debtor argues that because it was not given at all times access to and use of the *complete* Premises, it is entitled to complete rent abatement. Debtor's Reply, *supra*, Dkt. No. 132, at 20.

Because both the Landlord and the Debtor make essentially the same argument and reach opposite conclusions, the Court finds the argument flawed and unconvincing. In addition, the documents admitted into evidence and the testimony of the witnesses suggest that neither party took these extreme positions until their negotiations on amendments to the Lease or a new lease broke down, even as the renovations on the Building were moving ahead at full speed.

The Debtor knew that the Building was going to be rehabbed, knew that its operations could be affected by that rehab, and entered into a lease that took the practical effects of the rehab into account. By executing the Lease, the Debtor waived and released all claims against the Landlord for damages for interruptions or stoppages of services caused by the rehab and

---

[8] Interestingly, § 13.4 of the Lease entitled "Abatement of Rent for Untenantability" provides a specific mechanism for rent abatement, as follows:

> In the event all or any part of the Premises is rendered untenantable because of damage by fire or other casualty, and such damage shall not have been due to the fault or neglect of Tenant, Base Rent and Additional Rent payable by the Tenant shall abate as provided for in the next sentence during the period in which Premises or any portion thereof is untenantable. Rent so abated shall be computed on a per diem basis and shall be that portion of the then current per diem Base Rent and Additional Rent for the entire Premises which the area of the part of the Premises rendered untenantable bears to the area of the entire Premises.

agreed that there would be no rent abatement for those interruptions. Lease, §§ 1.3, 8.8, 12. However, in the event that the Debtor was actually denied access to its Premises, the Debtor would be entitled to rent abatement. *Id.* Denial of access is exactly what happened here. The Debtor, for a time, did not have *any* access to and thus could not run its business in the Main Dining Room, the Private Dining Room, or the Atrium. The Debtor was, however, always able to run its business in the Bar & Grill area and kitchen, although from time to time it had to deal with the mess and inconvenience caused by the Landlord's rehab work. In mid-October 2014, the Debtor regained access to the Main Dining Room and Private Dining Room, but its improvements to the Premises in those areas were greatly destroyed. As late as early November 2015, the Landlord was still doing construction work in the Atrium and had not given the Debtor assurances that it was done with its work in that area. Gaspar, Trial Tr. vol. 5, 138, Nov. 2, 2015; vol. 6, 57, 88-94, Nov. 4, 2015. The Debtor still does not have access to that portion of the Premises.

The Lease does not prevent partial rent abatement. In fact, there is a clear distinction in the Lease between the occasional disturbances to the Premises caused by necessary rehabilitation work, *see* Lease, §§ 1, 1.3, 8.8, 12.7, and a complete loss of access to and use of the Premises, *see* Lease, § 8.8. While the Lease does not have a specific mechanism for addressing rent abatement for partial loss of use of the Premises due to the rehab work, the mechanism outlined in § 13.4 provides appropriate guidance for addressing the situation that actually occurred in this case, whereby the Debtor was prohibited from *any* use of portions of its leased Premises for a period of time.

The Court finds that under the Lease and § 365(d)(3) of the Bankruptcy Code, the Landlord is entitled to post-petition rent for those portions of the Premises that the Debtor had access to and has been using in its business since the Petition Date, namely the Bar & Grill, including the kitchen, and the Main Dining Room. Under § 8.8 of the Lease, however, the Court denies the Landlord's request for post-petition rent for the Atrium and Private Dining Room portions of the Premises.[9]

In its Rent motion, the Landlord demands full base rent for the Premises under the Lease as the *minimum amount* of rent owing under the Lease. The Landlord alleges that it is also entitled under the Lease to percentage rent plus a *pro rata* share of taxes, late charges, and default interest. The Landlord reserves the right to seek additional amounts for such percentage rent, additional rent, and other amounts in the future.[10] The Court therefore limits its ruling to what the Landlord is demanding and awards the Landlord only base rent for the portions of the Premises outlined above, which constitute approximately 73.45% of the total Premises. *See* Resp. to Debtor's Objection to AH-River East, LLC's Mot. to Enforce Debtor-in-Possession's

---

[9] The Debtor has not been using the Dock area, so the Dock Rider does not obligate the Debtor to pay any rent. The Debtor is not required under the Lease to pay any base rent for the Sidewalk Café, Lease, §§ 1.3, 3.1, 6.2, and the provisions under which the Debtor might otherwise pay rent for the Sidewalk Café have not been triggered post-petition, Lease, §§ 3.2, 6.3.

[10] The Debtor may also be a holdover tenant and subject to rent under § 16.8 of the Lease, which gives Landlord the option to treat the Debtor as a month-to-month tenant liable for 150% of the rent under the Lease. However, the Landlord has not opted to treat the Debtor as such. Greiman, Trial Tr. vol. 8, 6-7, Nov. 23, 2015.

Obligation to Pay Post-Petition Rent, Dkt. No. 62, Ex. A, Decl. of Pleviak, at 2, ¶ 5. Thus, the Debtor is required to pay the Landlord the sum of $14,871 per month in post-petition rent under § 365(d)(3) from the Petition Date until the Debtor vacates the Premises.

Date: January 5, 2016

/s/ Janet S. Baer

Hon. Janet S. Baer
United States Bankruptcy Judge